UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ALYSHA B. WALKER; ROBERT H. WALKER;
and TAMI E. WALKER,

                               Plaintiffs,                8:10-CV-1578
                                                 (GTS/CFH)

v.

YOUNG LIFE SARANAC VILLAGE,

                              Defendant.
_____

APPEARANCES:                            OF COUNSEL:

THORN GERSHON TYMANN AND BONANNI, LLP    AMANDA K. KURYLUK, ESQ.
  Counsel for Plaintiffs                        ARTHUR H. THORN, ESQ.
5 Wembley Court, New Karner Road            ERIN P. MEAD, ESQ.
P.O. Box 15054
Albany, NY 12212-5054

GOLDBERG SEGALLA LLP                 LATHA RAGHAVAN, ESQ.
  Counsel for Defendant
8 Southwoods Boulevard, Suite 300
Albany, NY 12211-2526

GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

Currently before the Court, in this personal injury action filed by Alysha B. Walker and her parents, Robert H. Walker and Tami E. Walker (collectively "Plaintiffs") against Young Life Saranac Village ("Defendant"), are Plaintiffs' motion for partial summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 22), and Defendant's cross-motion to amend its Answer pursuant to Fed. R. Civ. P. 15(a) (Dkt. No. 27).  For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part, and Defendant's cross-motion is denied.

## I.      RELEVANT BACKGROUND

### A.      Plaintiffs' Claims

Generally, Plaintiffs' Amended Complaint alleges that Plaintiff Alysha (a citizen of Virginia) was injured at a summer camp owned and operated by Defendant (a not-for-profit New York corporation) in Saranac, New York, when, despite representing that it would "keep [Plaintiff] safe," Defendant allowed and encouraged Plaintiff Alysha to use a water slide carelessly located and maintained at a shallow portion of the lake at approximately 10:00 p.m. on July 26, 2009, without instructing Plaintiff how to use that water slide, causing her to sustain damages in excess of $75,000.  (*See generally* Dkt. No. 7 [Plfs.' Am. Compl.].)  Based on these factual allegations, Plaintiffs' Complaint, when liberally construed, asserts the following five claims against Defendant: (1) negligence; (2) gross negligence; (3) fraud; (4) breach of warranty; and (5) negligent misrepresentation.  (*Id*.)  Familiarity with the particular nature of these claims, and the factual allegations supporting them, in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties.  (*Id*.)

### B.      Defendant's Answer

In its Answer, Defendant asserted the following two affirmative defenses, among others: (1) an affirmative defense of assumption of risk; and (2) an affirmative defense of waiver.  (Dkt. No. 10, at ¶¶ 22, 24.)

### C.      Undisputed Material Facts

Unless otherwise supported by citations to the record, the following material facts have been asserted and supported by Plaintiffs in their Local Rule 7.1 Statement of Undisputed Material Facts, and either admitted or denied without a supporting record citation by Defendant in its Local Rule 7.1 Response.  (*Compare* Dkt. No. 22, Attach. 15 [Plfs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 7 [Def.'s Rule 7.1 Response].)

Defendant operates a camp for members of Young Life at Saranac Village, New York. Young Life is a national religious not-for-profit organization. Defendant's website states, among other things, that "Young Life is committed to making an impact on the lives of kids and preparing them for the future by sharing with them the gospel of Jesus Christ. With 15 outreach camps in the United States, thousands of high school and middle school students' lives are impacted every summer at these camps."[1] Defendant's website also states, among other things, that, at Saranac Village, students can "[r]elax and [p]lay on the [w]aterfront," and that, "[w]ith a core background of adventure and fun [students] will get to ask the tough questions of life and begin to piece together the answers."[2] The camp is not open to the general public as an amusement or recreational facility.[3]

Alysha was a YoungLife member in her home state of Virginia. Over the course of a year, during weekly meetings, she learned about the camp.[4] For example, her Young Life group leader in Virginia told her the "different things that [she] could do during the day [at Saranac Village]," including "water sports[,] . . . volleyball, a hot tub, [and] a slide . . . ."[5] During the summer of 2009, Alysha decided to attend Saranac Village with other members of her group and Young Life chaperones. Alysha was seventeen years old at the time.

_____

[1]        (Dkt. No. 22, Attach. 10, at 4 [Plfs.' Ex. I]; *cf.* Dkt. No. 27, Attach. 5, at ¶¶ 3, 5-7 [Affid. of Ryan Silvius].)

[2]        (Dkt. No. 22, Attach. 10, at 1 [Plfs.' Ex. I]; *cf.* Dkt. No. 27, Attach. 5, at ¶ 6 [Affid. of Ryan Silvius].)

[3]        (Dkt. No. 27, Attach. 5, at ¶ 7 [Affid. of Ryan Silvius]; Dkt. No. 22, Attach. 10, at 1-4 [Plfs.' Ex. I]; Dkt. No. 22, Attach. 11, at 11-12 [Plfs.' Ex. J]; *cf.* Dkt. No. 28, Attach. 2, at ¶¶ 5-6 [attaching Plfs.' Response to Def.'s Counter Statement of Material Facts, admitting this fact].)

[4]        (Dkt. No. 22, Attach. 6, at 7-9 [attaching pages "7" through "9" of Plfs.' Ex. E].)

[5]        (Dkt. No. 22, Attach. 6, at 16-17 [attaching pages "16" and "17" of Plfs.' Ex. E].)

Before Alysha arrived at camp, her parents gave her permission to attend the camp, and

filled out the necessary paper work.  Part of this paper work was a **"CAMPING HEALTH,**

**CONSENT AND RELEASE FORM**" (emphasis in original).  The form contained a

"**WAIVER AND RELEASE**" provision (emphasis in original), which stated as follows:

> IF I AM UNDER AGE 18, MY PARENT OR GUARDIAN, BY SIGNING
> BELOW, ALSO CONSENTS TO MY RELEASE AND HE OR SHE AGREES
> THAT THIS RELEASE SHALL BE BINDING UPON HIM OR HER AS MY
> PARENT OR GUARDIAN AS TO ME AND MY ESTATE, HEIRS,
> PERSONAL REPRESENTATIVES AND ASSIGNS. MY PARENT OR
> GUARDIAN ALSO PROMISES, BY SIGNING BELOW, TO DEFEND,
> INDEMNIFY AND HOLD YOUNG LIFE HARMLESS FROM ANY CLAIM
> ASSERTED BY ME AGAINST YOUNG LIFE, INCLUDING ITS TRUSTEES,
> EMPLOYEES AND AGENTS IF I SHOULD REPUDIATE THIS RELEASE
> AFTER OBTAINING ADULTHOOD.[6]

The form also contained an "**ACKNOWLEDGMENT OF INHERENT RISK**" provision

(emphasis in original), which was initialed by Alysha's mother, and which stated as follows:

> I ACKNOWLEDGE AND UNDERSTAND THERE ARE INHERENT RISKS
> ASSOCIATED WITH MANY CAMP ACTIVITIES. I WILL ASSUME THE
> RISK ASSOCIATED THEREWITH KNOWN OR UNKNOWN TO ME AT
> THIS TIME. I RECOGNIZE THAT MY ATTENDANCE AT A YOUNG LIFE
> CAMP IS A PRIVILEGE AND AS A CONSIDERATION FOR THIS
> PRIVILEGE, I RELEASE YOUNG LIFE, INCLUDING ITS EMPLOYEES,
> AGENTS AND TRUSTEES, FROM RESPONSIBILITY FOR MY
> ACCIDENTAL PHYSICAL INJURY, INCLUDING DEATH OR ILLNESS,
> AND LOSS OF PERSONAL PROPERTY WHILE AT CAMP OR DURING
> YOUNG LIFE SPONSORED TRAVEL TO AND FROM CAMP. THIS
> RELEASE IS ALSO INTENDED TO INCLUDE ALL CLAIMS MADE BY MY
> FAMILY, ESTATE, HEIRS, PERSONAL REPRESENTATIVE OR ASSIGNS.[7]

Alysha, with the other members and chaperones, traveled by bus from Virginia to

Saranac Village, arriving late in the afternoon on Sunday, July 26, 2009.  Upon arrival, Alysha

and her group were gathered for a 30-minute meeting, during which they were told about, among

---

[6]      (Dkt. No. 22, Attach. 12, at 3-4 [attaching pages "3" and "4" of Plfs.' Ex. K].)

[7]      (Dkt. No. 22, Attach. 12, at 3-4 [attaching pages "3" and "4" of Plfs.' Ex. K].)

other things, the activities and rules at the camp.[8]  At that time, they were instructed on the rules relating to the slide, including the rule "to lift [their] feet up while [they] went down the slide . . . so [they] would . . . land kind of on their bottom."[9]  Then they stored their belongings in their assigned cabins, and were given free time before dinner.  During free time that evening, Alysha and some of her friends went to the lake, where for an hour or two they went tubing and sat on the dock and watched other kids swim and use the water slide.[10]  At the time, Alysha had been down a water slide only once before, at a pool.

The water slide was first installed in the 1970s.  The portion of the slide installed on land is stationary.  The portion of the slide installed over the water is anchored on pedestals and is taken out of the water each winter (and reinstalled every season by camp employees or volunteers).  Depending on the water level of the lake, the pedestals of the slide must be raised or lowered throughout the season.  While both a waterfront manual and Department of Health written plan existed at the time which might have contained procedures regarding the water slide (among other things), no record is maintained as to when the level of the slide is changed, what the level is after the change is complete, or what the level of the slide was on July 26, 2009.[11]  Similarly, there are no written requirements stating where the pedestals of the slide should be

---

[8]      (Dkt. No. 22, Attach. 6, at 18-19 [attaching pages "18" and "19" of Plfs.' Ex. E].)

[9]      (Dkt. No. 22, Attach. 6, at 26-28 [attaching pages "26" through "28" of Plfs.' Ex. E]; *cf.* Dkt. No. 28, Attach. 2, at ¶¶ 14-15 [attaching Plfs.' Response to Def.'s Counter Statement of Material Facts, admitting this fact].)

[10]      (Dkt. No. 22, Attach. 6, at 19-21 and 28-30 [attaching pages "19" through"21," and "28" through "30," of Plfs.' Ex. E].)

[11]      (Dkt. No. 22, Attach. 9, at 19, 30-31, 47 [attaching pages "19," "30," "31" and "47" of Plfs.' Ex. E].)

installed from one year to the next.[12]  Rather, Defendant's waterfront staff or maintenance staff

decide where to install the slide and when adjustments need to be made to it.  Typically, it was

the waterfront director who made the decision to change the elevation of the slide from time to

time during the course of a season.[13]

While watching other campers use the water slide on July 29, 2006, Alysha saw that the

bottom of the slide was in the water.[14]  While at the time no one told Alysha that the water was

shallow where the slide ended, she saw other campers land in the water,[15] and heard them

complaining that the slide hurt their bottom.[16]  In addition, Alysha heard that another camper was

injured using the slide earlier that day (although, at the time, Alysha did not hear how that girl

was injured).[17]  Alysha did not use the slide during her free time, because she was too scared to

go down it.

---

[12]      (Dkt. No. 22, Attach. 9, at 19 [attaching page "19" of Plfs.' Ex. E]; *see also* Dkt. No. 27, Attach. 7, at ¶ 24 [admitting factual assertion].)  Generally, the camp manager imagines that the pedestals are installed each year in slight different locations, within a couple inches of the prior location in any direction.  (Dkt. No. 22, Attach. 9, at 45 [attaching page "45" of Plfs.' Ex. E].)

[13]      (Dkt. No. 22, Attach. 9, at 29-30 [attaching pages "29" and "30" of Defs.' Ex. H].)

[14]      (Dkt. No. 22, Attach. 6, at 48 [attaching page "48" of Plfs.' Ex. E]; *cf.* Dkt. No. 28, Attach. 2, at ¶¶ 31-32 [admitting factual assertion].)

[15]      (Dkt. No. 22, Attach. 6, at 49 [attaching page "49" of Plfs.' Ex. E].)

[16]      (Dkt. No. 22, Attach. 6, at 24-25 and 29 [attaching pages "24," "25" and "29" of Plfs.' Ex. E].)

[17]      (Dkt. No. 22, Attach. 6, at 22-23 [attaching pages "22" and "23" of Plfs.' Ex. E].) Later that day, after her accident, Alysha met the girl, Madeline Hendricks, and saw that she was wearing a knee brace.  (Dkt. No. 22, Attach. 6, at 61-62 [attaching pages "61" and "62" of Plfs.' Ex. E]; *cf.* Dkt. No. 22, Attach. 9, at 22-23 [attaching pages "22" and "23" of Defs.' Ex. H].)  It is unclear whether Defendant created an accident report for Ms. Hendricks' accident, or reported that accident to the New York State Department of Health.  (Dkt. No. 22, Attach. 9, at 39-41 [attaching pages "39" through "41" of Plfs.' Ex. H].)

After her free time was over, Alysha had dinner and then went with the other campers to a big auditorium where they sang songs and had a Bible lesson.[18]  They were told they would be participating in a surprise activity and had to return to their rooms to change into clothes that they would not mind getting dirty and retrieve their flashlights.[19]  After they did so and returned to the auditorium, they were divided into groups to participate in an obstacle course as a part of a team building activity.[20]  At that time it was dusk or dark.[21]  Alysha and her group left the auditorium and completed about five obstacles, working together as they were instructed to do by leaders.[22]  Then Alysha and her group arrived at the water slide obstacle.

Alysha was the first one in her group to go down the slide.  She gave her flashlight to her team leader and climbed the ladder to the top of the slide.  At the top of the slide, Alysha could

---

[18]     (Dkt. No. 22, Attach. 6, at 29-30 [attaching pages "29" and "30" of Plfs.' Ex. E].)

[19]     (Dkt. No. 22, Attach. 6, at 30-31 [attaching pages "30" and "31" of Plfs.' Ex. E].)

[20]     Plaintiffs assert that what the groups participated in was negotiating an "obstacle course," and support that factual assertion with a citation to admissible record evidence.  (Dkt. No. 22, Attach. 15, at ¶ 38 [citing pages "30" and "31" of Plfs.' Ex. E].)  While Defendant denies this factual assertion and asserts that what the groups participated in was a "team building activity," Defendant provides no record citation in support of that denial and assertion.  (Dkt. No. 27, Attach. 7, at ¶ 38.)  As a result, the Court accepts Plaintiff's "obstacle course" assertion as undisputed.  However, this does not end the matter, because the Court will not turn a blind eye to the fact that the record contains admissible evidence supporting Defendants' assertion that what the groups were participating in was, indeed, part of a "team building activity."  (Dkt. No. 22, Attach. 6, at 31-33 [attaching pages "31" through "33" of Plfs.' Ex. E]; *see also* Dkt. No. 22, Attach. 15, at ¶ 39 [asserting that each group's chaperon was referred to as "a team leader"]; *cf.* Dkt. No. 28, Attach. 2, at ¶ 21 [attaching Plfs.' Response to Def.'s Counter Statement of Material Facts, admitting this fact].)  Because of this fact, and the fact that the two factual assertions are not mutually exclusive, the Court accepts both factual assertions as true for purposes of this motion.

[21]     (Dkt. No. 22, Attach. 6, at 30-31 [attaching pages "30" and "31" of Plfs.' Ex. E]; Dkt. No. 22, Attach. 9, at 23-24 [attaching pages "23" and "24" of Plfs.' Ex. H].)

[22]     (Dkt. No. 22, Attach. 6, at 31-34 [attaching pages "31" through "34" of Plfs.' Ex. E].)

not see where she was going; it was totally dark and the area was surrounded by trees.  A camp

leader at the top of the slide had a flashlight, as did another camp leader and other campers

below; but Alysha does not remember any of them directing their flashlights toward the slide.[23]

Nor does Alysha remember seeing any lights on the dock in front of the slide, although they may

have existed.[24]  She was told by a camp leader at the top of the slide to lean back, cross her arms

over her chest and keep her legs up.[25]  As Alysha slid down the slide, she lay back flat with her

arms around her chest; and she tried to lift her legs up but had difficulty doing so.[26]  She suspects

---

[23]      (Dkt. No. 22, Attach. 6, at 43-47 [attaching pages "43" through "47" of Plfs.' Ex. E].)

[24]      (Dkt. No. 22, Attach. 6, at 47 [attaching page "47" of Plfs.' Ex. E]; Dkt. No. 22, Attach. 9, at 24-25 [attaching pages "24" and "25" of Plfs.' Ex. H].)

[25]      (Dkt. No. 22, Attach. 6, at 37-39 [attaching pages "37" through "39" of Plfs.' Ex. E].)  Based on the current record, a genuine dispute of material fact exists as to whether the camp leader also told Alysha that the reason she had to keep her legs up when she went down the water slide was that "the lake was very shallow that day."  (*Compare* Dkt. No. 22, Attach. 6, at 38-39, 48-49 [attaching pages "38," "39," "48" and "49" of Plfs.' Ex. E] *with* Dkt. No. 27, Attach. 7, at ¶ 47; Dkt. No. 22, Attach. 13, at 2 [attaching Plfs.' Interrogatory Response No. 3].) Plaintiffs' belated verification of their interrogatory responses appears to attempt to draw a fine line between the information Alysha "had available to her" when she helped her attorney prepare those responses at some point before August 18, 2011 (in which admitted being told the lake was shallow) and contrary information of which she subsequently came into possession (e.g., information giving rise to her contrary deposition testimony of August 15, 2011).  (Dkt. No. 37.) Any such attempt is unavailing.  Plaintiffs are under a continuing duty to amend their interrogatory responses if (1) they learn that those responses are in some material respect incomplete or incorrect and (2) the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.  Fed. R. Civ. P. 26(e)(1)(A). Here, it can hardly be said that Alysha's vacillating deposition testimony (in which she first denies remembering whether a camp leader told that the water was shallow, then denies that a camp leader told her the water was shallow) can hardly be characterized as "correct[ing]" the information provided in her prior interrogatory response.  As a result, if the response is not accurate, then it should have been amended; and Plaintiffs' failure to amend that response prevents them from disclaiming the existence of the admission contained in the response now.

[26]      (Dkt. No. 22, Attach. 6, at 39-41 [attaching pages "39" through "41" of Plfs.' Ex. E].)

that, when she landed in the water, her feet went straight to the lakebed.[27]  She cannot remember if her bottom landed on the lakebed.[28]  But she knew she was hurt.[29]  She was taken to the hospital and diagnosed with a fractured ankle.[30]

Familiarity with the remaining undisputed (and disputed) material facts on Plaintiffs' motion is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties.

    **D.    Parties' Briefing on Plaintiffs' Motion for Partial Summary Judgment**

Generally, in support of their motion for partial summary judgment, Plaintiffs assert the following two arguments: (1) the affirmative defense of waiver asserted in Defendants' Answer should be dismissed because, based on the current record, no genuine dispute of material fact exists that (a) the purpose of Defendant's youth camp is recreational in nature, rendering the defense unenforceable under N.Y. General Obligations Law § 5-326, and (b) in any event, the relevant portion of the Consent and Release Form in this case was not explicit in its terms, rendering it invalid as a matter of law; and (2) the affirmative defense of assumption of risk asserted in Defendants' Answer should be dismissed because, based on the current record, no

---

[27]    (Dkt. No. 22, Attach. 6, at 41 [attaching page "41" of Plfs.' Ex. E].)  (*See also* Dkt. No. 22, Attach. 13, at 2 [attaching Plfs.' Interrogatory Response No. 3].)  Again, Plaintiffs' failure to amend their interrogatory response prevents them from disclaiming the existence of the admission contained in the response now.

[28]    (Dkt. No. 22, Attach. 6, at 41 [attaching page "41" of Plfs.' Ex. E].)

[29]    (Dkt. No. 22, Attach. 6, at 41, 43 [attaching pages "41" and "43" of Plfs.' Ex. E].)

[30]    ( *Compare* Dkt. No. 22, Attach.  15, at ¶ 49 [attaching Plfs.' Statement of Material Facts]) *with* Dkt. No. 27, Attach.  7, at ¶ 49 [attaching Def.'s Response to Plfs.' Statement of Material Facts, admitting this fact].)  The Court notes that, while Alysha asserts that Defendant closed the slide the day after her accident, she does not based that assertion on personal knowledge.  (Dkt. No. 22, Attach. 14, ¶ 2 [Affid. of Alysha Walker, asserting fact based on "common knowledge"].)

genuine dispute of material fact exists that (a) the "Acknowledgment of Inherent Risk" provision contained in the Consent and Release Form does not mention the water slide and asks the signatory to assume "unknown" risks, rendering that provision ineffective, (b) Plaintiff Alysha was not aware of risks the water slide presented, did not appreciate the nature of the risk, and did not voluntarily assume the risk, rendering the defense unavailable, and (c) in any event, even if Plaintiff Alysha assumed the risk inherent in the activity in question, Defendant still had, but breached, a duty to exercise care to make the conditions as safe as they appeared to be.  (*See generally* Dkt. No. 22, Attach. 16 [Plfs.' Memo. of Law].)

Generally, in response to Plaintiffs' motion for partial summary judgment, Defendant asserts the following three arguments: (1) pursuant to the correct choice-of-law analysis, Defendant's assumption-of-risk defense is governed by Virginia law (which holds that assumption of risk is an absolute defense that employs a subjective test), rendering the defense available to Defendant; (2) in any event, even if Defendant's assumption-of-risk defense were governed by New York law (which holds that assumption of risk is a partial defense that employs an objective test), the defense would be available to Defendant, in part because Plaintiffs signed a Consent and Release form, and Plaintiff Alysha observed others going down the water slide before her injury and knew she was supposed to land on her bottom, not her feet; and (3) with regard to Defendant's waiver defense, in the event the Court determines that New York law governs that defense after conducting the correct choice-of-law analysis, the Court should find that, based on the current record, a genuine dispute of material fact exists as to whether Defendant's property is a place of recreation or a place of instruction for purposes of Gen. Oblig. Law § 5-326, whether Defendant "receives a fee or other compensation for the use of such facilities" for purposes of Gen. Oblig. Law § 5-326, and whether the terms of the waiver

were sufficiently specific and clear, rendering the defense of waiver available to Defendant. (Dkt. No. 27, Attach. 8, at 2-5, 9-15 [attaching pages "1" through "4," and "8" through "14," of Def.'s Opp'n Memo. of Law].)

Generally, in reply to Defendant's response, Plaintiffs assert the following four arguments: (1) under the correct choice-of-law analysis, New York law governs Defendant's assumption-of-risk defense, and warrants the dismissal of that defense; (2) in any event, even if Virginia law governed Defendant's assumption-of-risk defense, the dismissal of that defense would be warranted; (3) under the correct choice-of-law analysis, New York law governs Defendant's waiver defense, and warrants the dismissal of that defense; and (4) in any event, even if Virginia law governed Defendant's waiver defense, the dismissal of that defense would be warranted.  (Dkt. No. 28, Attach. 3, at 16-25 [attaching pages "16" through "25" of Plfs.' Reply Memo. of Law].)

**E.     Parties' Briefing on Defendant's Cross-Motion to Amend Its Answer**

Generally, in support of its cross-motion to amend its Answer to assert the affirmative defense of charitable immunity under Virginia law, Defendant argues as follows: (1) a conflict of law exists between Virginia law (which does recognize the affirmative defense of charitable immunity) and New York law (which does not recognize that defense); (2) pursuant to the correct choice-of-law analysis, Virginia law governs, in part because the application of that law is necessary to prevent forum shopping by Plaintiffs; and (3) based on a weighing of the factors governing a leave-to-amend analysis pursuant to Fed. R. Civ. P. 15(a), Defendant should be permitted to amend its Answer, under the circumstances, including the relatively early stage of this action, and the lack of prejudice to Plaintiffs.  (Dkt. No. 27, Attach. 8, at 2-9 [attaching pages "1" through "8" of Def.'s Opp'n Memo. of Law].)

11

Generally, in their reply, Plaintiffs respond to Defendant's cross-motion as follows: (1) because the deadline to amend pleadings (set forth in this action's Uniform Pretrial Scheduling Order) expired before the filing of Defendant's motion, Defendant must show, but has not shown, good cause for failing to seek leave to amend before the deadline; and (2) in any event, even if Defendant had shown good cause for its failure to comply with the filing deadline, its cross-motion should be denied based on a weighing of the factors governing a leave-to-amend analysis pursuant to Fed. R. Civ. P. 15(a), including the fact that Plaintiffs would be prejudiced by being no longer able to serve paper discovery and conduct party depositions, and the fact that the defense in question is futile (under either New York law or Virginia law).  (Dkt. No. 28, Attach. 3, at 1-16 [attaching pages "1" through "16" of Plfs.' Reply Memo. of Law].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing a Motion for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that  well-known legal standard in this Decision and Order, but will direct the reader to the Court's recent decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which recites that legal standard.

### B.    Legal Standard Governing a Motion to Amend

Pursuant to Fed. R. Civ. P. 15(a)(2), leave to amend should be freely given in the absence of any apparent or declared reason to not grant leave to amend, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

amendment, or futility of amendment.  *Jones v. McMahon*, 98-CV-0374, 2007 WL 2027910, at

*10 (N.D.N.Y. July 11, 2007) (Lowe, J.); *Meyer v. First Franklin Loan Servs, Inc.*, 08-CV-1332,

2010 WL 277090, at *1 (N.D.N.Y. Jan. 19, 2010) (Suddaby, J.).

    Further, Fed. R. Civ. P. 16 provides that, where a scheduling order has been approved in

the case, the deadlines may be modified "only for good cause and with the judge's consent."

Fed. R. Civ. P. 16(b)(4).  To establish good cause, the party seeking the modification must

"show that the deadlines could not reasonably be met despite its diligence."  *Toborg v. United*

*States*, 11-CV-0150, 2012 WL 3643841, at *2 (N.D.N.Y. Aug. 23, 2012) (Sharpe, J.) (citing

*Robinson v. Town of Colonie*, 91-CV-1355, 1993 WL 191166, at *3 [N.D.N.Y. June 3, 1993]

[McCurn, J.]).  Local Rule 16.1(f) of the Local Rules of Practice for this District similarly

provides that "[t]he Court shall strictly enforce any deadline that it establishes in any case

management order, and the Court shall not modify these, even upon stipulation of the parties,

except upon a showing of good cause."  N.D.N.Y. L.R. 16.1(f).

## III.    ANALYSIS

### A.    Whether Plaintiffs' Motion for Partial Summary Judgment Regarding Defendants' Affirmative Defense of Waiver Should Be Granted

    Generally, when "the language of the exculpatory agreement expresses in unequivocal

terms the intention of the parties to relieve a defendant of liability for the defendant's negligence,

the agreement will be enforced."  *Lux v. Cox*, 32 F. Supp. 2d 92, 98 (W.D.N.Y. 1998) (citing

*Lago v. Krollage*, 78 N.Y.2d 95 [N.Y. 1991]).[31]  Here, Plaintiffs admit that Waiver and Release

---

[31]    For the reasons stated below in Part III.C.2. of this Decision and Order, the Court
applies New York law to the affirmative defenses of both waiver and assumption of risk.
However, the Court agrees with Plaintiffs that, even if Virginia law were to apply to both of
those affirmative defenses, the Court would reach the same result as it does based on New York
law.

provision of the Consent and Release Form was properly signed.  However, Plaintiffs argue that

the Waiver and Release provision is invalid because (1) it violated N.Y. General Obligations

Law § 5-326, and (2) in any event, it was expressed in equivocal terms.

### 1.   Invalidity Under General Obligations Law § 5-326

General Obligations Law § 5-326 provides as follows:

> Every covenant, agreement or understanding in or in connection with, or
> collateral to, any contract, membership application, ticket of admission or similar
> writing, entered into between the owner or operator of any pool, gymnasium,
> *place of amusement or recreation, or similar establishment* and the user of such
> facilities, pursuant to which such owner or operator receives a fee or other
> compensation for the use of such facilities, which exempts the said owner or
> operator from liability for damages caused by or resulting from the negligence of
> the owner, operator or person in charge of such establishment, or their agents,
> servants or employees, shall be deemed to be void as against public policy and
> wholly unenforceable.

N.Y. Gen. Oblig. Law § 5-326 (McKinney) (emphasis added).

"In assessing whether a facility is instructional or recreational, courts have examined,

inter alia, the organization's name, its certificate of incorporation, its statement of purpose and

whether the money it charges is tuition or a fee for use of the facility."  *Applbaum ex rel.*

*Applbaum v. Golden Acres Farm and Ranch*, 333 F. Supp. 2d 31, 36 (N.D.N.Y. 2004) (Hurd, J.);

*Lemoine v. Cornell Univ.*, 2 A.D.3d 1017, 1019 (N.Y. App. Div., 3d Dep't 2003).  Courts focus

"less on a facility's ostensible purpose and more on whether the person was at the facility for the

purpose of receiving instruction."  *Applbaum*, 333 F. Supp. 2d at 36 (citing *Scrivener v. Sky's*

*The Limit*, 68 F. Supp. 2d 277, 281 [S.D.N.Y. 1999]).

Here, Defendant argues that the camp provides instruction in the gospel through

meetings, bible studies, speakers and discussions.  (Dkt. No. 27, Attach. 8, at 14-15 [attaching

pages "13" through "14" of Def.'s Opp'n Memo. of Law].)  The record contains, inter alia, an

affidavit from Camp Manager Ryan Silvius stating that the purpose of the camp is to introduce students to gospel in a team-building, fun adventurous and relational manner.  (Dkt. No. 27, Attach.  5, at 1 [attaching "Affidavit of Ryan Silvius" to Def.'s Response.)  The record also contains Defendant's certificate of incorporation, which explicitly mentions "ministry," which a reasonable jury could find to be instructional in nature.  (Dkt. No. 22, Attach. 11, at 11 [attaching "Application for Authority" contained in Ex. J to Plfs.' Motion].)  Although there appears to be no case law applying General Obligations Law § 5-326 to ministerial facilities, courts in New York State have declined to grant summary judgment against other facilities that may serve a mixed purpose.  *See, e.g., Fusco v. Now & Zen, Inc.*, 294 A.D.2d 466, 467 (N.Y. App. Div., 2d Dep't 2002) (denying plaintiff's motion for summary judgment because genuine dispute of material fact existed as to whether defendant's karate studio was a place of recreation or instruction for purposes of Gen. Oblig. Law § 5-326); *Dematteo v. Yoga Moments Studio*, 2007 N.Y. Slip Op. 31498(U) (Sup. Ct. Suffolk Cnty. May 14, 2007) (denying plaintiff's motion for summary judgment because defendant's yoga studio was instructional rather than recreational under Gen. Oblig. Law § 5-326).

    In the alternative, the Court finds that Gen. Oblig. Law § 5-326 does not bar Defendant's affirmative defense of waiver because, at the very least, a genuine dispute of material fact exists regarding whether Defendant "receives a fee or other compensation for the use of such facilities" for purposes of Gen. Oblig. Law § 5-326.  *See Geise v. Niagara Cnty.*, 458 N.Y.S.2d 162, 164 (N.Y. Sup. Ct., Erie Cnty. 1983) (finding that Gen. Oblig. Law § 5-326 did not void a release because "[t]he plaintiff concedes that he was not issued a ticket of admission nor did he pay a fee before entering Bond Lake").  The Court acknowledges that Defendant does not expressly assert that Alysha did not pay some sort of fee in connection with her attendance at the camp.  (*See*

*generally* Dkt. No. 27, Attach. 7 [attaching "Def.'s Respnse to Plfs.' Statement of Facts and Def.'s Counter-Statement of Material Facts"). However, Defendant does assert that it is "not an amusement or recreational facility that the general public can pay a fee to attend," and that it "makes no profit from this venture." (Dkt. No. 27, Attach. 7, at ¶¶ 6-7.) Moreover, Plaintiffs do not expressly assert that Alysha did pay a fee. (*See generally* Dkt. No. 22, Attach. 15.) Under the circumstances, the Court finds that a genuine dispute of material fact has been sufficiently raised on this issue.

Therefore, the Court declines to grant summary judgment to Plaintiffs on this basis.

## 2.   Invalidity Due to Lack of Specificity

Under New York law, it is "well settled . . . that the law frowns upon contracts intended to exculpate a party from the consequences of his own negligence . . . ." *Gross v. Sweet*, 49 N.Y.2d 102, 106 (N.Y. 1979) (citation omitted).[32] As a result, although "with certain exceptions[] they are enforceable, [such] agreements are subject to close judicial scrutiny . . . ." *Gross*, 49 N.Y.2d at 106 (citation omitted).

"[U]nless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts . . . ." *Id*. at 107 (citations omitted). More specifically, "it must appear plainly and precisely that the limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility." *Id*. (internal quotation marks and citations omitted).

---

[32]    It is important to note that, "[t]o the extent that agreements purport to grant exemption for liability for willful or grossly negligent acts they have been viewed as wholly void . . . ." *Gross*, 49 N.Y.2d at 106 (citations omitted).

16

Generally, "if such is the intention of the parties, the fairest course is to provide explicitly that claims based on negligence are included . . . ."  *Id.* at 108 (citation omitted).  "That does not mean that the word 'negligence' must be employed for courts to give effect to an exculpatory agreement; however, words conveying a similar import must appear . . . ."  *Id.* (citations omitted).[33]  Examples of words conveying such a similar import include the words "neglect" or "fault."  *Gross*, 49 N.Y.2d at 108 (citing *Theroux v. Kedenburg Racing Assn.*, 269 N.Y.S.2d 789, 792 [N.Y. Sup. Ct., Suffolk Cnty. 1965]).  However, "[a]n amorphous 'any and all clause' does not 'exact the release of liability of a drafter's own negligent conduct.'"  *Applbaum*, 333 F. Supp. 2d at 35.

As explained above in Part I.B. of this Decision and Order, the Consent and Release Form contained the following Waiver and Release provision:

> I ACKNOWLEDGE AND UNDERSTAND ***THERE ARE INHERENT RISKS ASSOCIATED WITH MANY CAMP ACTIVITIES***.  I WILL ASSUME THE RISK ASSOCIATED THEREWITH, WHETHER KNOWN OR UNKNOWN TO ME AT THIS TIME.  I RECOGNIZE THAT MY ATTENDANCE AT YOUNG LIFE CAMP IS A PRIVILEGE AND ***AS A CONSIDERATION FOR THIS PRIVILEGE***, ***I RELEASE YOUNG LIFE, INCLUDING ITS EMPLOYEES,*** AGENTS AND TRUSTEES ***FROM RESPONSIBILITY FOR ACCIDENTAL PHYSICAL INJURY***, INCLUDING DEATH OR ILLNESS, AND LOSS OF PERSONAL PROPERTY ***WHILE AT CAMP*** . . . ***THIS RELEASE*** IS ALSO INTENDED TO INCLUDE ALL CLAIMS MADE BY MY FAMILY, ESTATE, HEIRS, PERSONAL REPRESENTATIVE OR ASSIGNS . . . MY PARENT OF GUARDIAN BY ALSO ***PROMISES***, BY SIGNING BELOW, ***TO*** DEFEND, INDEMNIFY AND ***HOLD YOUNG LIFE HARMLESS FROM ANY CLAIM ASSERTED BY ME AGAINST YOUNG LIFE***.

(Dkt. No. 22, Attach. 12, at 3 [Plfs.' Ex. K] [emphasis added].)

---

[33]     *Accord*, *DeVito v. New York Univ. Coll. of Dentistry*, 145 Misc. 2d 144, 147 (Sup. Ct., New York Cnty. 1989) ("In those instances where releases from liability which do not contain the word "negligence" have been construed to include negligent behavior, the words used have referred to the concept of fault in specific and unambiguous terms.").

As can be seen, the Waiver and Release provision makes no reference to "negligence." However, as explained above, that fact does not end the Court's inquiry. The Court must turn to the italicized language in the Waiver and Release provision.

The italicized language at the end of the Waiver and Release provision is insufficient to shield defendant from liability. Although the concept of fault is obliquely referenced by the language that "this release . . . promises . . . to . . . hold Young Life harmless from any claim asserted by [the signatory] against Young Life," courts applying New York law have repeatedly held that similar language is insufficient to shield a defendant from liability for negligence.[34]

However, the italicized language in the top and middle of the Waiver and Release provisions more squarely references the concept of fault. This section provides that "I release YoungLife, including its employees, . . . from responsibility for accidental physical injury . . . while at the camp [engaging in risky camp activities]," in exchange for the "privilege" of being able to "attend[] . . . [the] camp." Granted, one court has found a simple reference to "injuries or damages that the plaintiff may sustain while on defendant's premises" not to be immediately

---

[34]     *See, e.g., Applbaum*, 333 F. Supp. 2d at 35 (holding that a release in which plaintiff agreed to hold defendant "harmless from every and all claim which may arise from injury, which might occur from use of said horse and/or equipment" was insufficient to shield defendant from liability for negligence); *Rigney v. Ichabod Crane Cent. Sch. Dist.*, 59 A.D.3d 842, 843 (N.Y. App. Div., 3d Dep't 2009) (holding that a "release in which [plaintiff] agreed to hold defendant harmless for all claims arising in any way out of her participation in the [aerobics] class" was unenforceable because did not plainly state the precise limitation on liability); *Alexander v. Kendall Cent. Sch. Dist.*, 221 A.D.2d 898, 899 (N.Y. App. Div., 4th Dep't 1995) (holding exculpatory clause unenforceable because it "states only that the parent releases all rights and claims for damages against defendant 'for any and all injuries suffered' by the child or the parent at the wrestling tournament"); *Rice v. Harley Davidson Inc.*, 04-CV-0481, 2005 WL 1843250, at *2 (N.D.N.Y. Aug. 1, 2005) (Mordue, J.) ("The courts also find 'release and hold harmless' language frequently utilized in the disclaimer clauses as insufficiently specific.").

understood by a layman as referencing any and all consequences of defendant's carelessness.[35]

However, the Waiver and Release provision in this case appears to sufficiently reference the

consequences of *defendant's* unintentional fault and/or neglect.

Specifically, it is difficult for the Court to imagine how the language "I release . . .

[Defendant] from responsibility for accidental physical injury" can be reasonably be understood

as meaning anything other than *Defendant's* responsibility for physical injury to Plaintiff: if the

language was intended to mean *someone else's* responsibility for such a physical injury, there

would be no reason to release *Defendant* from that responsibility.  Similarly, it is difficult for the

Court to imagine how the term "release from responsibility for accident[]" can be reasonably be

understood as meaning anything other than *unintentional fault or negligence*: if the language was

intended to mean something other than unintentional fault or negligence, then the term

"responsibility for accident[]" would not have been used.  *See Hopkins v. Long Island R.R. Co.*,

251 N.Y.S.2d 590, 591 (N.Y. App. Div. 2d Dept. 1964) (holding that pass which entitled railroad

employee to passage on railroad and which provided that person accepting and receiving pass

"assume[d] all risks of accidents to person and property" barred employee's recovery based on

railroad's negligence, "despite the fact that the stated condition did not contain a clause

specifically exculpating defendant from liability 'by reason of negligence'"), *accord*, *Litter v.*

*Long Island R.R. Co.*, 299 N.Y.S.2d 598, 599, 601 (N.Y. City, Civ. Ct., Queens Cnty. 1969); *cf.*

*Theroux v. Kedenburg Racing Assn.*, 269 N.Y.S.2d 789, 792 (N.Y. Sup. Ct., Suffolk Cnty. 1965)

(granting defendant's motion for summary judgment on ground of waiver and release, where

---

[35]      *See DeVito*, 145 Misc.2d at 148 ("No layman perusing this release [which agreed
to save harmless defendant from any and all liability arising out of, or in connection with, any
injuries or damages that the plaintiff may sustain while on its premises, or as a result of any
treatment in its infirmaries] would find it immediately understandable that the signatory had
contracted to accept not only injuries that might ordinarily and inevitably occur, but also any and
all consequences of defendants' carelessness.").

agreement provided for release of liability for any injury "regardless of how such injury . . . may arise, and regardless of who is at fault . . . and even if the loss is caused by the neglect or fault of" the defendant), *aff'd*, 28 A.D.2d 960, 282 N.Y.S.2d 930 (N.Y. App. Div., 2d Dept. 1967).[36]

The only other thing the Court can imagine that term as meaning under the circumstances is physical injury caused by recklessness or gross negligence.  However, as explained above in note 32 of this Decision and Order, to the extent that waivers or releases purport to grant an exemption from liability for willful or grossly negligent acts, they are void.  *See, supra,* note 32 of this Decision and Order.  As a result, the Court will grant Plaintiff's motion to the extent that it requests the dismissal of Defendant's affirmative defense of waiver aimed at Plaintiffs' claim of gross negligence only.  (*Compare* Dkt. No. 7, at ¶ 37 [Plfs.' Am. Compl., asserting claim of "gross negligence"] *with* Dkt. No. 10, at ¶ 24 [asserting affirmative defense of waiver with respect to Plaintiffs' "claims"].)  Otherwise, the Court denies Plaintiff motion for summary judgment with respect to this affirmative defense.

---

[36]    The Court has found only one adverse case involving release employing language somewhat similar to the language employed in this case.  While that case treated the language as insufficiently specific, it appears to have done so only because the defendant did not oppose plaintiff's argument that the language was insufficiently specific (which is not the case here). *See Harrell v. Champlain Enter. Inc.*, 613 N.Y.S.2d 1002, 1003 (N.Y. App. Div., 3d Dept. 1994) ("The pass stated on its face that '[t]he user expressly assumes all risks of accidents, and of personal injury and/or death . . . regardless of their causes, and absolves [defendant] from all liability therefor.' [I]t is undisputed that under New York law the language of the release was not sufficiently explicit to exculpate defendant for its own negligence . . . ."), *aff'g*, 603 N.Y.S.2d 115, 116 (N.Y. Sup. Ct., Albany Cnty. 1993) ("The plaintiff seeks to dismiss the defense, contending that under New York case law the release is invalid because it does not contain specific language stating that the defendant will not be liable for injuries or death caused by its own negligence . . . .  The defendant does not argue that the release would be valid under New York law . . . .").  In any event, the waiver in the case before the Court contains more language than does the waiver in *Harrell*, more clearly describing "accidental physical injury" to Plaintiff for which "Young Life, including its employees, agents and trustees" may bear "responsibility."

**B.      Whether Plaintiffs' Motion for Partial Summary Judgment Regarding
Defendants' Affirmative Defense of Assumption of Risk Should Be Granted**

Assumption of risk may be either express or implied.  *Furey v. United States*, 458 F.

Supp. 2d 48, 55-56 (N.D.N.Y. 2006) (Sharpe, J.).  Express assumption of risk may exist when

there is an "agreement in advance that defendant need not use reasonable care for the benefit of

plaintiff and would not be liable for the consequence of conduct that would otherwise be

negligent." *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 301 (2d Cir.

1997) (citing *Arbegast v. Board of Educ.*, 65 N.Y.2d 161, 169 [N.Y. 1985]).  Implied assumption

of risk may exist when a plaintiff voluntarily encounters a risk emanating from a defendant's

conduct with a full understanding of the possible harm to himself and unreasonably consents to

the risk under the circumstances.  *Arbegast*, 65 N.Y.2d at 169.

Here, Defendant's Answer does not expressly state whether Defendant's affirmative

defense of assumption of risk is based on the doctrine of express assumption of risk or the

doctrine of implied assumption or risk (or both doctrines).  (Dkt. No. 10, at ¶ 22.)  However,

Plaintiffs reference both doctrines in their initial memorandum of law.  (Dkt. No. 22, Attach. 16,

at 6.)  In addition, Defendant references both doctrines in its opposition  memorandum of law.

(Dkt. No. 28, Attach. 8, at 8.)  As a result, the Court will address each doctrine in this Decision

and Order.

**1.      Defense of Express Assumption of Risk**

The doctrine of express assumption of risk has survived New York's adoption of its

comparative negligence statute.[37] *Furey*, 458 F. Supp. 2d, at 55-56.  However, the doctrine of

---

[37]      New York's comparative negligence statute provides as follows: "[i]n any action
to recover damages for personal injury . . . the culpable conduct attributable to the claimant . . . ,
*including contributory negligence or assumption of risk, shall not bar recovery*, but the amount
of damages otherwise recoverable shall be diminished in the proportion which the culpable
conduct attributable to the claimant or decedent bears to the culpable conduct which caused the
damages."  N.Y. C.P.L.R. § 1411 (emphasis added).

express assumption of risk requires that the claimant had been aware of the specific risk that resulted in injury, and had voluntarily assumed that risk, *at the time the written agreement was signed.  Integrated Waste Servs., Inc.*, 113 F.3d at 301; *see, e.g., Long v. State*, 158 A.D.2d 778, 780 (N.Y. App. Div., 3d Dep't 1990) (declining to apply express assumption-of-risk defense because "claimant was not apprised of the risks involved in the situation that he was about to encounter").  Here, the record contains no admissible evidence from which a rational fact finder could conclude that Plaintiff was aware of the specific risk of going down a water slide at the time the written agreement was signed.

As a result, Plaintiffs' motion for summary judgment is granted to the extent that it seeks the dismissal of Defendant's affirmative defense of express assumption of risk.

### 2.     Defense of Implied Assumption of Risk

Unlike the doctrine of express assumption of risk, the doctrine implied assumption of risk was abrogated and subsumed by the comparative negligence statute.  *Schneider v. Revici*, 817 F.2d 987, 994-95 (2d Cir.1987).  Here, as indicated above in Part I.C. of this Decision and Order, the following facts are uncontroverted, based on the current record: (1) during the 30-minute meeting she attended when she arrived at the camp, Alysha was told about, among other things, the rules relating to the slide, including the rule "to lift [their] feet up while [they] went down the slide . . . so [they] would . . . land kind of on their bottom"; (2) during the one to two hours she watched other campers use the slide, she saw other campers land in the water, and heard them complaining that the slide hurt their bottom; and (3) immediately before the accident, she was told by a camp leader at the top of the slide to keep her legs up, but she failed to do so.  In addition, based on the current record, a genuine dispute of material fact exists as to (1) whether Plaintiff was specifically informed that the lake was "very shallow that day" before she slid, and

(2) whether Alysha's injury was caused by a dangerous condition that was over and above the usual dangers inherent in sliding into a lake.

As a result, Plaintiffs' motion for partial summary judgment is denied to the extent that it requests the dismissal of the defense of implied assumption of risk, also known as comparative negligence.

### C.   Whether Defendant's Cross-Motion to Amend Its Answer to Assert the Affirmative Defense of Charitable Immunity Should Be Granted

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's reply memorandum of law.  (Dkt. No. 28, Attach. 3, at 1-16 [attaching pages "1" through "16" of Plfs.' Reply Memo. of Law].)  The Court would add only the following analysis.

#### 1.   Lack of Showing of Good Cause for Violating Filing Deadline

Here, the Uniform Pretrial Scheduling Order states that "[a]ny application to amend any pleading in this action shall be made on or before July 15, 2011."  (Dkt. No. 12.)[38]  Defendant filed its motion more than four months after this deadline expired; as a result, Defendant is required to show good cause for is untimely motion, under Fed. R. Civ. P. 16(b)(4).

Defendant gives four reasons to support its motion to amend, none of which establishes good cause for its untimeliness.  First, Defendant argues Plaintiff is not prejudiced because discovery is ongoing.  However, this fact does show why the original deadline could not reasonably be met despite Defendant's diligence.  *See, supra,* Part II.B. of this Decision and Order (reciting relevant legal standard).  Second, Defendant asserts that amendment is necessary

---

[38]     The Scheduling Order was modified on November 16, 2011.  (Dkt. No. 25.) However, this extension did not extend the deadline to amend pleadings.  (*Id.*)

to protect against forum shopping.  However, again, such a fact does not show why the original deadline could not reasonably be met despite Defendant's diligence.  *Id.*  Third, Defendant asserts that the defense was only discovered as a result of Plaintiff's motions.  Although this may be true, a diligent organization in Defendant's situation should have been able to recognize the potential defense long before the deadline expired.  Indeed, Plaintiffs' domicile appears in the first paragraph of the complaint.  (Dkt. No. 1, at ¶ 1.)  Finally, Defendant has cited two cases in which leave to amend was freely granted for an affirmative defense; however, there is no indication that a scheduling order deadline had expired in those cases.  *Pani v. Empire Blue Cross Blue Shield*, 93-CV-8215, 1996 WL 734889, at *2 (S.D.N.Y. Dec. 23, 1996), *aff'd*, 152 F.3d 67 (2d Cir. 1998); *Rinaldi v. City of New York*, 756 F. Supp. 111, 116, n.3 (S.D.N.Y. 1990). The Court also considers the fact that these parties have already amended the scheduling order once and could easily have requested to do so regarding the pleading deadline.

For all of these reasons, the Court denies Defendant's motion to amend as untimely. Because the Court has found an adequate reason to deny Defendant's motion to amend, it need not analyze Plaintiffs' alternative argument in favor of denying that motion (i.e., the futility of Defendant's proposed amendment); however, in the interest of thoroughness, the Court will briefly analyze that argument.

### 2.    Futility of Proposed Amendment

Defendant admits that New York law does not recognize the defense of charitable immunity, but argues that Virginia law (which does recognize the defense of charitable immunity) should be applied.[39]   As a result, an actual conflict is apparent and a conflict of law

---

[39]      It is undisputed that New York does not recognize charitable immunity.  *Bing v. Thunig*, 2 N.Y.2d 656, 666-67 (N.Y. 1957); *Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d

analysis is necessary.  Under this analysis, the Court finds that New York law applies to the

present case.

 Faced with a conflict of law, this Court must look to New York's choice-of-law

principles to determine the law that applies to this litigation.  *See, e.g., Tischmann v.

ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1366 (S.D.N.Y. 1995).  Under New York's choice-of-

law principles, three rules are used to determine applicability of conflicting loss allocation

statutes.[40]  *Neumeier v. Kuehner*, 31 N.Y.2d 121, 128 (N.Y. 1972).  The first *Neumeier* rule

addresses situations where the parties share a common domicile.  *Cooney v. Osgood Mach.*, 81

N.Y.2d 66, 72-73 (N.Y. 1993).  The second *Neumeier* rule addresses situations where only one

party is domiciled in the State where the injury occurred.  *Cooney*, 81 N.Y.2d at 72-73.  Finally,

the third *Neumeier* rule is applicable to other split-domicile cases.  *Id.*  Here, the parties do not

dispute that Plaintiffs are domiciliaries of Virginia and Defendant is a domiciliary of Colorado.

Thus, both parties correctly apply the third rule to the present case.

 Under the third *Neumeier* rule, Courts will normally apply the law of the State where the

injury occurred.  *Neumeier*, 31 N.Y.2d at 128.  A different rule may be used only "if it can be

shown that displacing that normally applicable rule will advance the relevant substantive law

purposes without impairing the smooth working of the multi-state system or producing great

---

Cir. 2003) ("Although New York . . . once recognized charitable immunity, [it] abolished the
doctrine long before the events giving rise to this suit.").  In contrast, Virginia recognizes
charitable immunity, provided that the charity exercises due care in the selection and retention of
their servants or agents.  *Kuykendall v. Young Life*, 261 F. App'x 480, 488 (4th Cir. 2008) (citing
*Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 486 [Va. 2004]).

[40]    It is well established that charitable immunity statutes are loss-allocation statutes.
*See, e.g., Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (N.Y. 1994).

uncertainty for litigants." *Id.*; *Edwards v. Erie Coach Lines Co*, 17 N.Y.3d 306, 329 (N.Y. 2011).  The number and intensity of contacts is particularly relevant to this determination. *Edwards,* 17 N.Y.3d at 329 (applying New York law because the injury occurred in New York and the Defendant "had no contacts whatsoever with Ontario other than the happenstance that plaintiffs and the [co-defendants] were domiciled there").

Here, the injury occurred in New York.  The Court has considered the fact that Defendant operates a branch in Virginia, and that Plaintiff admittedly associated herself with this Virginia branch.  However, the mere happenstance that Plaintiff hailed from Virginia is insufficient to overcome the interest of New York.  *Edwards*, 17 N.Y.3d at 331.  Most importantly, the intensity of Defendant's contacts with New York is extensive.  Defendant has operated a permanent camp in New York since 1969 and is registered under New York's not-for-profit corporation law.  (Plfs.' Motion, Exhibit I, Exhibit J).  This permanent, longstanding, and continued presence in New York gives rise to a legitimate interest in protecting its residents and visitors from tortious conduct.  *Mihalic v. K-Mart of Amsterdam*, 363 F. Supp. 2d 394, 402-406 (N.D.N.Y. 2005) (Hurd, J.)  (holding that Pennsylvania's interest in applying workers compensation laws to suit against a Pennsylvania company not compelling enough to displace New York's interest over injury that occurred on New York construction site); *Whisenhunt v. Sylvania Corp.*, 671 F. Supp. 214, 219 (W.D.N.Y. 1987) (holding that out-of-state construction company operating in New York could reasonably anticipate to be sued under New York law when their out-of-state worker was injured on a New York job site).  Application of foreign law to this case would create unacceptable uncertainty for litigants such as Plaintiffs, who knew only that Defendant owned and operated a camp in New York.  Furthermore, application of New York law does not conflict with Defendant's reasonable expectations because Colorado law

would have similarly allowed the lawsuit.[41]

Therefore, New York's loss allocation law applies.  Because the parties agree that New York does not recognize charitable immunity, Defendant's motion to amend is denied on the alternative ground of futility.  *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) ("Where the amended portion of the complaint would fail to state a cause of action, however, the district court may deny the party's request to amend.").

**ACCORDINGLY,** it is

**ORDERED** that Plaintiffs' motion for partial summary judgment (Dkt. No. 22) is **<u>GRANTED</u> in part** and **<u>DENIED</u>** in part as described above in Part III of this Decision and Order; and it is further

**ORDERED** that Defendant's affirmative defense of waiver is **<u>DISMISSED</u>** only in so far as it is asserted as a defense to Plaintiffs' claim of gross negligence; and it is further

**ORDERED** that Defendant's affirmative defense of assumption of risk is **DISMISSED** only in so far as it based on the doctrine of express assumption of risk; and it is further

**ORDERED** that otherwise Defendant's affirmative defenses **<u>SURVIVE</u>** Plaintiffs' motion for partial summary judgment; and it is further

**ORDERED** that Defendant's cross-motion to amend its Answer (Dkt. No. 27) is **<u>DENIED</u>**; and it is further

---

[41]     Colorado does recognize the doctrine of charitable immunity; however, the "protection afforded to a charitable institution is not immunity from suit, not nonliability for a tort, but that the protection actually given is to the trust funds themselves." *Michard v. Myron Stratton Home*, 144 Colo. 251, 257 (Colo. 1960).  The record before the Court in this action is silent as to any applicable trust fund that would trigger the doctrine.  The Court notes that neither party requests the application of Colorado law.

**ORDERED** that counsel are directed to appear on **JANUARY 11, 2013 at 11:00 AM** in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than December 11, 2012, and the parties are directed to engage in meaningful settlement negotiations prior to the 1/11/13 conference.  In the event that counsel find that settlement is unlikely, if counsel would prefer to participate in this pretrial conference via telephone conference for the limited purpose of scheduling trial, counsel should make that request in writing.

Dated: November 21, 2012
        Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge